## COMMONWEALTH *vs.* HENRY S. BROWN.

Middlesex.     February 2, 1891. — May 22, 1891.

Present: FIELD, C. J., W. ALLEN, C. ALLEN, HOLMES, KNOWLTON, MORTON, & LATHROP, JJ.

*Intoxicating Liquors — Illegal Transportation — Aiding and Abetting.*

An employee of an express company, which is engaged in the illegal transportation of intoxicating liquors to a no license city, may himself be convicted of that offence, if after their arrival in the city he aids in forwarding them to their destination therein, having reasonable cause to believe that the same were intended to be sold there in violation of law, although he had no personal knowledge that the particular liquors had been ordered or were coming until they reached the company's city office, and did not himself bring, or manually aid in bringing them into the city, and could not have prevented their transportation there.

COMPLAINT under the Pub. Sts. c. 100, § 17, alleging that Henry S. Brown of Lowell, on September 8, 1890, did bring into the city of Lowell, " in which said city licenses of the first five

classes described in section ten of chapter one hundred of the Public Statutes of said Commonwealth were not then granted, certain intoxicating liquor, to wit, sixty-one gallons of lager beer, twenty-two gallons of ale, and five gallons of whiskey, he, the said Henry S. Brown, having then and there reasonable cause to believe that the same was intended to be sold in violation of the laws of said Commonwealth in said city of Lowell."

At the trial, on appeal, in the Superior Court, *Pitman*, J. refused to make certain rulings requested by the defendant, and, after a verdict of guilty, the defendant alleged exceptions, which appear in the opinion.

The case was argued at the bar in February, 1891, and afterwards, in April following, was submitted on the briefs to all the judges.

*W. I. Badger*, for the defendant.

*A. E. Pillsbury*, Attorney General, ( *C. N. Harris*, Second Assistant Attorney General with him,) for the Commonwealth.

MORTON, J. The defendant in this case was charged with bringing into the city of Lowell certain intoxicating liquors, having reasonable cause to believe that the same were intended to be sold in said city, in violation of law. It was agreed at the trial that the city of Lowell granted no licenses at the time named in the complaint. It is well settled that one who aids another in committing a misdemeanor is equally guilty with one who actually commits it. *Commonwealth* v. *Drew*, 3 Cush. 279. *Commonwealth* v. *Ray*, 3 Gray, 441. *Commonwealth* v. *Gannett*, 1 Allen, 7. *People* v. *Erwin*, 4 Denio, 129. *United States* v. *Gooding*, 12 Wheat. 460, 475, 476. *Regina* v. *Greenwood*, 16 Jur. 390. And this rule has been applied in this State to statutory offences arising under the liquor law, so called. *Commonwealth* v. *Galligan*, 144 Mass. 171, 173. *Commonwealth* v. *Murphy*, 145 Mass. 250. In the present case, there was no testimony directly connecting the defendant with the transportation of the liquors which he was charged with bringing into the city of Lowell. The next question is whether there was any evidence tending to show that he aided or abetted in any way in bringing them into that city ; and we think there was such evidence.

The defendant was the agent in Lowell of the New England

Despatch Company, which was a common carrier between Boston and Lowell and other places. He drove one of the wagons in Lowell, and hired and had charge of the other drivers there. In the ordinary course of the business of the company, some of the goods carried by it to Lowell were received and transported in the following way. Customers in Lowell wrote their orders, which were enclosed in sealed envelopes directed to certain parties in Boston, and sent or brought them to the company's office in Lowell. Sometimes the defendant took them, and sometimes others in the office, but generally the cashier. These orders were put into a messenger's box in the office, and were taken by the messenger to Boston, and there delivered to the various parties to whom they were directed. Another person, a driver in the company's employ at Boston, called at the various places for the goods thus ordered, and collected and delivered them to the baggage master of the Boston and Maine Railroad, who placed them in the baggage car, under the charge of one of the company's Lowell messengers, and on the way to Lowell they were checked off by the messenger on the way bills accompanying the goods. Neither the defendant nor any of the employees knew the contents of the orders, and the way bills did not describe the contents of the packages. When the goods arrived at Lowell they were delivered to the employees of the company, of whom the defendant was one, and they delivered them to the parties ordering them.

The liquors in question were brought into Lowell by the company in the ordinary course of business, as thus described, but the defendant had no personal knowledge that they had been ordered or were to be received at Lowell till they were in the company's office at Lowell, and none of the other employees at the Lowell office knew of it till the messenger checked off the packages containing them, after the train had left Boston. There was evidence tending to show that a part of the liquors described in the complaint were marked " B Club," and that the defendant told one of the government witnesses that liquors marked " B Club " were to be delivered to such persons in Lowell as should be designated by a man named Bartlett in Lowell; and a short time prior to September 8, 1890, the day named in the complaint, liquors marked " B Club," on the boxes

of which were the company's tags, had been found in places in Lowell where liquors were illegally sold. There was also evidence that the defendant knew, or had reasonable cause to believe, that a portion of the liquors in question were intended to be sold in Lowell, in violation of law, and that the express company had previously brought intoxicating liquors into Lowell with such knowledge, or with reasonable cause to believe that it was to be so sold. It also appeared that the defendant had been before cautioned by police officers at Lowell not to deliver liquor to illegal dealers therein, and had replied that he was not doing different from other express companies, and was not doing as much as some of the others. It further appeared, that teams under the defendant's direction had been delivering liquors constantly since the first of May previous, and he stated in the course of his testimony that he had to see that things went on right; that he had charge of the teams and drove some himself; that he first took charge after the goods reached Lowell; and that he meant by the reply above referred to that he was not bringing so much beer as the rest of the companies.

Upon this evidence, it was clearly competent for the jury to find, as they must have found under the instructions * of the

---

* These instructions were as follows: " The first question is whether the liquors in question, or some of them, were brought into the city of Lowell in violation of this statute; that is, brought with the intent to have the same sold by another, or having reasonable cause to believe that the same was intended to be sold in violation of law. If the jury are satisfied beyond a reasonable doubt that they were so brought, the next question is, Is the defendant liable ? It is a well settled general principle of law that all persons who either commit a misdemeanor or knowingly and voluntarily aid, abet, assist, or encourage the commission thereof by any subordinate or collateral acts, are equally guilty as principals. I am not aware of any evidence in this case which directly connects the defendant with the bringing of this liquor into the city of Lowell, — any evidence directly connecting him. There is evidence tending to show that it was so brought by the New England Despatch Company, and that the defendant was the Lowell agent of the said company. Exactly what his service was has been put in evidence by himself. He called himself an agent, and the precise duties are to be settled upon testimony. It may not be precisely important, but it will show what the limit of his authority is; that, however, alone would not establish his liability. If nothing else appeared, the jury would be bound to return a verdict of not guilty. The defendant would not be responsible, either, for a casual violation of the statutes in which he had not knowingly participated.

court, that the despatch company undertook the business of transporting intoxicating liquors to Lowell indiscriminately as a general and habitual practice, where they knew or had reasonable cause to believe that the same were intended to be used in violation of law. And the jury must have further found, as they were also justified in doing under the instructions of the court, that the defendant knew that such was their course of business, and knowingly assisted and aided in the same by his own acts, and that the liquors in question, or a part of them, were brought into Lowell in pursuance of such general course of business in which the defendant so participated, and were in fact illegally transported, and that the defendant formed a necessary part of the machinery in carrying on this illegal business. The defendant's first request, therefore, that upon the evidence he could not be convicted, was properly refused.

The defendant cannot excuse himself on the grounds set up in his remaining requests for rulings which were refused, namely, that he was not guilty unless he himself brought the liquors into Lowell or controlled the persons who did, or if the persons who brought it in were under the direction and control of the Boston superintendent of the company, or if the liquors were brought into Lowell in the ordinary course of business without his knowledge, and it was beyond his power to regulate

---

But if the jury are satisfied that the despatch company, through its appropriate officers and agents, for its own lucre and gain, undertook the business of transporting intoxicating liquors to Lowell indiscriminately, and as a general and habitual practice to transport such liquors where they knew or had reasonable cause to believe that the same were intended to be sold in violation of law, and the defendant knew that such was their course of business and knowingly assisted and aided in the same by his own acts, and these liquors, or any part of them, were brought into the city of Lowell in pursuance of such general scheme or course of business which the defendant so participated in, and these liquors were in fact so illegally transported, then he may be held liable therefor; that is to say, if he voluntarily went in and aided and encouraged a general business of transporting intoxicating liquors, then he is liable for specific acts of this kind because he aided and participated in the business which led to the taking of such goods. If he performed any necessary part of the machinery in carrying on this illegal business, then he became a participator in the business, and would be liable for acts done in the usual and ordinary course. It is for you to say whether this case, by the evidence, is brought within the law. If he was participating in the business, then he is answerable for the whole doing of the business.''

or control the goods shipped to Lowell from Boston or other places. When the liquors arrived at Lowell he knew, or had reasonable cause to believe, that they were intended for sale in Lowell in violation of law. He had reason to know from the course of the business that they had been brought to Lowell from Boston, pursuant to an order from a dealer in Lowell to a dealer in Boston. And he knew that, when they arrived at Lowell, both the shipper in Boston and the orderer in Lowell expected that he would aid in forwarding them to their destination in Lowell. He himself expected to do this, and to do it as one step in the transportation from the vendor in Boston to the purchaser and illegal seller in Lowell. In the strict sense of the words, therefore, he was aiding in bringing into Lowell intoxicating liquors with reasonable cause to believe that they were to be there sold in violation of law. He was one link in the chain of transportation from the shipper in Boston to the illegal seller in Lowell, and he knowingly and voluntarily occupied that position. It was not necessary that he should know at every moment and every step what every one else did who was engaged in aiding, or abetting, or committing the misdemeanor. So far as he was concerned, all that was necessary was that it should appear that he knowingly aided in the commission of the misdemeanor charged. If he did, he was liable. *Regina v. Swindall*, 2 C. & K. 230. For these reasons, a majority of the court think that there was no error in the instructions, and that the defendant's requests were rightly refused.

*Exceptions overruled.*

---

JOHN M. POWERS *vs.* CITY OF BOSTON.

Suffolk.    March 6, 9, 1891. — May 22, 1891.

Present: FIELD, C. J., C. ALLEN, HOLMES, MORTON, & LATHROP, JJ.

*Personal Injuries — Defect in Highway — Street Railway — Contributory Negligence.*

It is not necessary that an obstruction in a highway should endanger all modes of public travel in order to be a defect; it is enough that it makes any mode dangerous which the public has a right to use.

In an action against a city by a street car conductor, injured in the evening by a collision with a barrier put up to guard a point where a street had caved in, a witness testified that the danger from the caving in had ceased the morning before. The jury, in connection with an instruction that they might find the barrier to be a defect if such a change had occurred as to render its removal proper, were allowed to decide whether the witness meant that the danger to the public had ceased because the barrier had been put up, or because a further caving in was not to be feared so that it was no longer necessary. *Held*, that . the question was properly left to the jury.

The plaintiff at the time of the accident stood upon the running board of an open car collecting fares, and, his person, which he allowed to project beyond the outer edge of the board, coming in contact with the barrier, which was placed within two inches of such outer edge, he was knocked off and sustained the injuries in question. He admitted that he had a general idea that there were some obstructions there, but testified that he did not know they were so near or so dangerous as they were. *Held*, that the question of the plaintiff's negligence was properly left to the jury.

The accident happened at a little after sunset on September 7, and there was evidence that it was misty. Both the plaintiff and a passenger on the car testified that they did not notice any lights on the barrier. *Held*, that the questions whether it was dark, and whether the barrier was lighted, were properly left to the jury.

TORT for personal injuries occasioned to the plaintiff by an alleged defect in Washington Street in the defendant city. At the trial in the Superior Court, before *Staples*, J., the jury returned a verdict for the plaintiff; and the defendant alleged exceptions, which, so far as material to the points decided, appear in the opinion.

*W. S. B. Hopkins & C. T. Davis*, for the defendant.

*A. Hemenway & C. S. Knowles*, for the plaintiff.

HOLMES, J. This is an action to recover damages for personal injuries alleged to have been caused by a defect in a highway. The plaintiff was a conductor of a street car, and at the time of the accident was standing on the running-board of an open car, collecting fares, when he was knocked off and injured by being carried against a post planted in the highway within two inches of the edge of the running-board. The post was part of a barrier which had been put up as a guard where the street had caved in because of an excavation for a new building at the corner of Court Street and Washington Street.

On the question whether the barrier was a defect, the jury were instructed, in substance, that if the barrier as it stood was reasonably necessary to protect the public at the time of the accident, and if its position was indicated by sufficient lights, it

was not a defect, no matter how near it came to the railroad track; but that if it was not necessary, if it was carried too far into the street, if it was constructed so as to be a danger to public travel rather than a safeguard, the jury might find it to be a defect; or if the danger had been ended long enough reasonably to have enabled the posts to be removed, then it was a defect. These instructions are not much questioned as abstract propositions, and in our opinion they were correct. It is-true that, under the circumstances supposed, the barrier might not be a defect as towards people travelling on foot or in carriages, and that it might be one relatively to the street cars only by reason of its nearness to the track and their inability to turn out. But it is not necessary that a matter complained of should endanger all modes of public travel in order to be a defect. It is enough that it makes any mode dangerous which the public have a right to use. The ground is, not that street cars have greater rights than the public at large, but that travel by means of the street cars is one of the rights of the public at large. See *Gregory* v. *Adams*, 14 Gray, 242, 247; *Arey* v. *Newton*, 148 Mass. 598.

It is objected, however, that the instructions given allowed the jury to find that there had been such a change as to make it proper to remove the barrier, whereas in fact there was no such evidence. The question turns on the meaning of a witness, the inspector of buildings, in testifying that on Saturday morning the danger from the caving in had ceased, — the accident having happened Saturday evening. It was left to the jury to say whether he meant that the danger to the public had ceased because the posts had been put in as a protection against it, or because the danger of a further caving in of the street was over, so that the barrier was no longer necessary. Whatever we might have thought if all the language used by this witness had occurred in a written deposition, we cannot say that his words may not have admitted of two interpretations by those who heard them, and therefore we find no error here.

An exception is taken to leaving the question of the plaintiff's negligence to the jury. So far as the ruling requested rested upon the plaintiff's knowledge, it is to be observed that, while he admitted that he had a general idea that there were some

obstructions there, he said that he did not know that they were so near to the car or so dangerous as they were. No doubt, if a man voluntarily runs into a danger which he fully appreciates, in common cases he cannot recover for it, and it is rather a question of words than of substance whether he shall be called negligent, or shall be said to have taken the risk. *Miner* v. *Connecticut River Railroad*, 153 Mass. 398. But a man does not take the risk of every danger which may arise from certain causes merely because, in a general way, he is aware of the existence of those causes. *Thomas* v. *Western Union Telegraph*, 100 Mass. 156, 158. *Barton* v. *Springfield*, 110 Mass. 131. *Dewire* v. *Bailey*, 131 Mass. 169. *Lawless* v. *Connecticut River Railroad*, 136 Mass. 1, 5. *Ferren* v. *Old Colony Railroad*, 143 Mass. 197, 199. *Kelly* v. *Blackstone*, 147 Mass. 448, 451.

So far as the request for a ruling that the plaintiff was negligent was put upon the ground that he was standing on the running-board and allowed his person to project beyond the outer edge of the board, there can be no doubt, we think, that the question would be left to the jury in an action against the railroad company. *Meesel* v. *Lynn & Boston Railroad*, 8 Allen, 234. *Fleck* v. *Union Railway*, 134 Mass. 480. *City Railway* v. *Lee*, 21 Vroom, 435. *Geitz* v. *Milwaukee City Railway*, 72 Wis. 307. *Dahlberg* v. *Minneapolis Street Railway*, 32 Minn. 404. *Dickinson* v. *Port Huron & Northwestern Railway*, 53 Mich. 43. *Germantown Passenger Railway* v. *Walling*, 97 Penn. St. 55. *West Philadelphia Passenger Railway* v. *Gallagher*, 108 Penn. St. 524, 528. It is true that in such an action the plaintiff has the advantage that the defendant invited the conduct which it now alleges to have been negligent, but the reasoning of the cases is not wholly dependent upon this fact, and the same conclusion has been reached in actions against third persons in cases of collision. *Spofford* v. *Harlow*, 3 Allen, 176. *Connolly* v. *Knickerbocker Ice Co.* 114 N. Y. 104. There are many things to be considered in deciding upon the character of the plaintiff's conduct, and we cannot say that it seems to us so plainly negligent that the question should have been taken from the jury.

The only other point which is argued for the defendant is, that the judge sent the case to the jury in such a way that they may have found for the plaintiff on the ground that, although

the barrier necessarily was placed and left where it was, it was not lighted, and a light was necessary at the time of the accident, whereas, it is said, there is no evidence that it was dark or that there were no lights. But there was some evidence for the plaintiff on both points. The accident happened at or a little after sunset on September 7, and there was testimony that it was misty. The plaintiff and a passenger testified that they did not notice any lights. *Johanson* v. *Boston & Maine Railroad*, 153 Mass. 57. Without considering more nicely what would constitute a *prima facie* case entitling the plaintiff to go to the jury, we are of opinion that a new trial must be denied, and we reach the matter the more readily in view of the fact that the defendant did not ask a ruling that there was no evidence that the barrier was not lighted, and that the exception to the charge did not call the attention of the judge or the opposing counsel to the points now relied upon except in a very indirect way.                     *Exceptions overruled.*

---

COMMONWEALTH *vs.* GEORGE W. MESERVE & another.

Suffolk.     March 30, 1891. — May 26, 1891.

Present: C. ALLEN, HOLMES, KNOWLTON, & LATHROP, JJ.

*Indictment — Conspiracy — False Pretences — Evidence — Witness — Variance — Exceptions.*

An indictment alleging that the defendants M. and F. had unlawfully conspired with K. to defraud a corporation named out of certain building material, under the color of a pretended contract made between K. under the assumed name of B. and the corporation for furnishing the same and putting it into a building for K., and upon his credit under such name, by means of the false pretences to be made to the corporation by M. that K. was B., a man of wealth, and under that name was erecting a building, which he owned with the land under it, and needed such material therefor, and that K. under that name had given him, M., authority to make the contract on his behalf and under that name with the corporation, and intended to pay for such material and for putting in the same whenever the payment for the same should become due. *Held*, that the charge was of a conspiracy to obtain goods under the color of a contract between K. and the corporation, in which K. should pretend to be B. and should assume that name to be his own, and in which various other pretences were to be made in reference to the supposed B.; and that the indictment was sufficient.

It is within the discretion of the presiding judge at a trial to permit a leading question to be put to a witness in direct examination.

Upon the trial of an indictment for a conspiracy to obtain goods by means of a contract, to be fraudulently made by one K. under the assumed name of B., it is competent, for the purpose of establishing K.'s real name, to show that shortly before the alleged conspiracy he was married under the name of K., that he was usually known as K. or as St. C., and that his wife, while thereafter living with him, and before the date of the conspiracy, bore the surname St. C.

The erroneous admission of testimony in support of one count of an indictment, upon which the accused is acquitted, is not ground of exception.

The inability of a witness to read writing does not necessarily render him incompetent to testify to the identity of a written paper.

Upon the trial of an indictment for conspiracy, evidence of certain acts which took place several months subsequent to the date of the alleged conspiracy were *held* to be properly excluded.

Upon the trial of an indictment alleging a conspiracy to obtain goods by false pretences to be made by one K., to the effect that his name was B. and that he lived in a certain town and owned real estate there, residents of that town may testify that they know of no such person, although no one of them can state that he knows every resident in the town.

At such trial, an old resident of the town, who testifies that he is the register of deeds and town clerk, having the custody of the town records and assessors' books, and is familiar with them and with the people and land in the town, and that he is also a real estate agent and conveyancer, and has searched the records a good deal, may testify that no person of the above description owns real estate in the town, although he has not made special search with reference to testifying.

At the trial of an indictment against M. and F., for a conspiracy with K. to cheat under color of a contract to be fraudulently made by K. under the assumed name of B., evidence that K's. wife made a statement to F's. wife respecting the latter's husband in his absence, and that K. had written letters to a woman surnamed B. who was not a witness and whose relation to him was not shown, is incompetent.

A count charging a conspiracy to obtain goods by different indictable false pretences is supported by evidence of a conspiracy to cheat by some one of those pretences.

If an averment in an indictment is of a conspiracy to obtain certain goods, proof of a conspiracy to obtain goods and labor is no variance.

If a party makes no specific requests for instructions, a general exception to specified portions of the charge will not be sustained, unless some substantial error or injustice clearly appears.

Expressions in the rulings of the judge presiding at a trial, which standing alone might be the subject of exceptions, are to be qualified and interpreted by other rulings made in connection with them that would render such expressions unexceptionable.

INDICTMENT in five counts for a conspiracy to obtain goods by false pretences. The third count alleged that the defendants, " George W. Meserve and Nathaniel W. Foye, both of said Boston, together with one Samuel S. Kennedy, otherwise called

Samuel Kennedy, otherwise called Samuel Saint Clair, now deceased, being evil disposed persons, and wickedly devising and intending to cheat and defraud the Shreve, Crump, and Low Company, a corporation duly established and existing, on the first day of April in the year of our Lord one thousand eight hundred and eighty-nine, at Boston aforesaid, did unlawfully conspire, combine, confederate, and agree together falsely, knowingly, designedly, and fraudulently to cheat and defraud the said corporation out of a large quantity of property, goods, wares, and merchandise, of the property of the said corporation, that is to say, a large quantity of gas-pipe and gas-piping of great value, to wit, of the value of twenty-five dollars, under the color of a pretended contract between said Kennedy as and under the name of George Brown and said corporation, for furnishing and putting into a certain building hereinafter mentioned, by said corporation, said gas-pipe and gas-piping, for said Kennedy, and upon his said Kennedy's credit as and under the name of George Brown as aforesaid, by means of the false and fraudulent pretences thereafter to be made to said corporation by the said Meserve; that said Kennedy was one George Brown, who was a man of wealth and opulence residing in said Exeter, in the State of New Hampshire; that said Kennedy, as and under the name of George Brown as aforesaid, was constructing and erecting a building in that part of said Boston called East Boston, and was in need of gas-pipe and gas-piping for use in the constructing and erection of said building; that said Kennedy, as and under the name of George Brown as aforesaid, had given him, said Meserve, authority to make a contract, for and on behalf of said Kennedy, as and under the name of George Brown as aforesaid, with said corporation, for the furnishing and putting into said building by said corporation such gas-pipe and gas-piping; that said Kennedy, as and under the name of George Brown as aforesaid, was the owner of the said building and the land whereon said building stood; and that said Kennedy, as and under the name of George Brown as aforesaid, then intended to pay for the said gas-pipe and gas-piping and the putting in of the same, whenever the payment for the same became due."

The fifth count alleged that the defendants, " George W. Me-

serve and Nathaniel W. Foye, both of said Boston, together with one Samuel S. Kennedy, otherwise called Samuel Kennedy, otherwise called Samuel Saint Clair, now deceased, being evil disposed persons, and wickedly devising and intending to cheat and defraud one Job F. Bailey, on the second day of May, in the year of our Lord one thousand eight hundred and eighty-nine, at Boston aforesaid, did unlawfully conspire, combine, confederate, and agree together falsely, knowingly, designedly, and fraudulently to cheat and defraud the said Bailey out of a large quantity of goods, wares, and merchandise of the property of said Bailey, — that is to say, a large quantity of doors, windows, blinds, window-frames, and sash, to wit, sixty-three window-frames each of the value of three dollars, sixty-six doors each of the value of four dollars, fifty-four windows each of the value of three dollars, divers sash each of the value of one dollar, — under color of a pretended purchase of and from said Bailey of said property, goods, wares, and merchandise by said Kennedy, upon the credit of said Kennedy as and under the name of George Brown, by means of the false and fraudulent pretences thereafter to be made to said Bailey by said Meserve, Foye, and Kennedy, that said Kennedy was one George Brown, a man of wealth and in opulent circumstances, who then resided in Exeter, in the State of New Hampshire; that said Kennedy, so to be represented as George Brown as aforesaid, was the owner of real estate in said Exeter, of great value, to wit, of the value of between fifteen thousand dollars and twenty thousand dollars; that he, said Kennedy, so to be represented as George Brown as aforesaid, had recently theretofore sold seven thousand dollars' worth of real estate of him, said Kennedy, so to be represented as George Brown as aforesaid, in said State of New Hampshire, and had invested the proceeds thereof in property in said Boston; that said Foye was the agent of said Kennedy, so to be represented as George Brown as aforesaid, for the erection and construction of certain buildings in divers parts of said Boston and elsewhere in said Commonwealth; and that said Kennedy, so to be represented as George Brown as aforesaid, then intended to pay for said property, goods, wares, and merchandise, so falsely and fraudulently to be purchased and obtained as aforesaid, upon the credit of him, said Kennedy, as

and under the said name of George Brown, within thirty days after the delivery thereof."

At the trial in the Superior Court, before *Mason,* C. J., the jury returned a verdict of guilty against Meserve alone on the third count, and against both defendants on the fifth count, and of not guilty on the first and fourth counts; and the defendants alleged exceptions, which, so far as material to the points decided, appear in the opinion.

*E. Avery & G. R. Swasey,* for the defendants.

*A. E. Pillsbury,* Attorney General, (*C. N. Harris,* Second Assistant Attorney General with him,) for the Commonwealth.

C. ALLEN, J. The defendants were tried on four counts, the first, third, fourth, and fifth. Meserve was convicted on the third and fifth counts, and Foye on the fifth only. The objections urged are to the validity of the indictment, to the evidence, and to the instructions of the judge.

The motion to quash the third count rests on the ground that it is uncertain and vague, and that the defendants could not tell from it whether they were to be tried for a conspiracy to obtain goods by making an unauthorized contract for goods and labor, and also by means of false pretences, or whether they were to be tried for a conspiracy to obtain goods by means of a pretended contract for goods and labor, which said contract was to be obtained by false pretences. It appears to be sufficiently plain that the count charges a conspiracy to obtain goods under color of a contract between Kennedy and the corporation, in which Kennedy should pretend to be Brown; the name of Brown was to be pretended or assumed by Kennedy to be his own; and various other pretences were to be made in reference to the supposed Brown. The count is sufficient. *Commonwealth* v. *Walker,* 108 Mass. 309.

The objection to the fifth count is substantially similar.

Numerous objections were taken to the admission or exclusion of evidence, only a part of which are now insisted on.

The defendants contend that a question put on direct examination to the government witness, Amanda A. Kennedy, was leading. The objection was not put on that ground at the trial, and if it had been it was within the discretion of the presiding judge to allow it. *Green* v. *Gould,* 3 Allen, 465. *York* v. *Pease,* 2 Gray, 282.

It was competent to show that Kennedy, alias Brown, was married shortly before the conspiracy charged under the name of Kennedy, and that he usually went under that name, or the name of St. Clair, and also that his wife while living with him shortly before the time of the alleged conspiracy went under the name of Mrs. St. Clair. All this would have some tendency to show that the assumption of the name of Brown was a mere pretence, and that the agreement that he should assume that name for the purpose of obtaining goods on credit was a conspiracy to cheat.

The evidence of Meserve's conversation as to an attempt to get a horse in Dublin, New Hampshire, was given in connection with a conversation about a plan for Meserve and Kennedy to go to New Hampshire to get some brick by cheating somebody there. This testimony was in support of the first count, and had no relation to the third or fifth counts, on which alone a conviction was had. The jury having acquitted the defendants on the first count, the admission of this evidence, whether right or wrong, is now immaterial.

The judge might properly hold that the written documents testified to by Mrs. Kennedy were sufficiently identified to be laid before the jury, although she was unable to read. The mere fact that a witness cannot read writing does not necessarily render him incompetent to testify to the identity of a written paper. He still has the size, form, color, and general appearance of the paper, the color of the ink, and the size and general characteristics or appearance of the writing, to go by. For example, one might be allowed to testify to the identity of a paper written in Greek, Hebrew, Sanscrit, or Egyptian hieroglyphics, although unable to read a word of either language. The weight of the testimony would of course be for the jury.

The testimony of the witness Googin, which was excepted to, was offered under a misapprehension as to what her testimony would be, and this was stated as soon as she had answered the questions. The testimony was not injurious in its nature, and there is no reason to suppose that it prejudiced the defendant Meserve.

The witness Reed was asked on cross-examination whether his action with reference to foreclosure was influenced by an inter-

view with Mr. Pratt. This action with reference to foreclosure and the interview referred to were several months after the date of the conspiracies charged in the indictment, and the question might properly be excluded as immaterial.

The evidence that the lumber sent to Newton Highlands was marked " George Brown," for a building which Foye was erecting there, had a tendency to show that Kennedy was then assuming the name of Brown, and that Foye was cognizant of it. It bore directly upon the charge against Foye, and was competent for this purpose, although it may not have borne upon the charge against Meserve. Moreover, this testimony appears to have had relation only to the first count, upon which the defendants were acquitted.

The question to the witness Carpenter, " What talk did you have with him ? " — that is, with Brown, — was properly allowed. There had been sufficient evidence of a conspiracy between Meserve and Kennedy, alias Brown, to warrant the judge in admitting declarations by the latter. No objection was taken to any particular part of the answer, on the ground that it related to matters outside of the charges in the indictment.

The witness Stark was asked on cross-examination for certain particulars as to the purchase of the Porter lot, so called, and of the building contract for that lot. These particulars were properly excluded as immaterial. That purchase was several months before the transactions which are charged in the indictment. The fact that there was no attempt by Meserve to defraud in reference to that purchase and that building contract, if conceded, would be unimportant; if not conceded, the admission of the evidence would raise an issue of itself traversable and foreign to those on trial. Moreover, it does not appear that it was urged against either of the defendants that there was an overvaluation in the original purchase of the Reed lot by Meserve from Reed. There was no occasion to prove affirmatively that the price paid was reasonable.

The questions to the residents of Exeter were competent. One principal element in the alleged conspiracy being that Kennedy should assume to be George Brown, a man of wealth, residing in Exeter, and then or recently an owner of real estate there, it was competent to show by the witnesses that they

knew of no such man. The witnesses testified to a general acquaintance with the inhabitants and owners of real estate in that town. It was not necessary that each witness should be able to state absolutely that he knew every resident. The witness Belknap testified that he was an old resident of the town, the registrar of deeds, the town clerk, having custody of the town records and assessors' books, and that he was familiar with them; that he was also a real estate agent and conveyancer, and had searched the records a great deal. He might properly be allowed to testify that there was no such owner of real estate in Exeter as George Brown; that is, no person of that description. The point was that no man of that name and description lived there. The question of his means was held by the court to be immaterial. The only practicable way in practice to prove that no deed appears of record is to show that an examination of the records discloses none. The court and jury cannot look through the records for themselves. The evidence of the witness might not be entitled to so much weight as if he had made special search with reference to testifying; but his general statement, founded not only upon his familiarity with the records, but upon his knowledge of the people and of the land of the town, might properly be received. The authorities cited to show that facts which appear of record must be proved by the records, or by copies thereof, are not applicable to show that oral testimony is inadmissible to show that a particular fact does not appear of record.

The statement of Mrs. Kennedy, alias Brown, to Mrs. Foye, that "Tom will fix him," (referring to one Eldridge, a man hired by Foye,) was properly excluded. We see no ground on which it was material or important, it having been said in the absence of the person referred to. It would have no tendency to contradict him, or affect his testimony.

The price that Porter was willing to accept for building the house on the Reed lot was properly excluded; or, if material in any aspect of the case, it could only be with reference to counts upon which no conviction was had. In the third and fifth counts, there was no charge which would make it material. At the time of the conspiracies therein charged, the title was in Brown. A proposed building contract between Meserve and

Porter, and Porter's uncompleted negotiation for building, do not in any way tend to negative the charges of subsequent conspiracies, as set forth in the third and fifth counts.

It was immaterial to show that Kennedy, alias Brown, wrote letters while in the state prison to a person called Flora Brown. She was not herself called as a witness. No evidence was offered to show that there was any relationship between them, and the fact of his writing letters to a woman called Flora Brown would of itself have no tendency to show that his true name was Brown.

The other exceptions taken at the trial in respect to the admission or exclusion of evidence are not now insisted on.

The ground of exception which appears to be most strongly relied on is, that the judge instructed the jury, in substance, that where an indictment charges a conspiracy to obtain goods by various different false pretences, it will not be a variance if it is proved that there was a conspiracy to obtain the goods by any one of the false pretences which are set out. This instruction was given in reference to the first count; but assuming that it was also applicable to the third and fifth counts, on which alone a conviction was had, we are of opinion that it furnishes no valid ground of exception.

It is conceded in the argument for the defendants, that, in an indictment for obtaining goods by false pretences, the government is not held to proof of all the pretences alleged. See cases cited in 2 Bish. Crim. Proc. §§ 165–171. But if there is no variance in such case, it certainly would savor of great refinement to hold that there is a variance when the indictment charges a conspiracy to obtain the goods by several false pretences, and only one is proved. The ground taken in argument is, that in the latter case the agreement between the conspirators is not proved as laid. But the means by which the cheating is to be accomplished are not necessarily to be held to be indivisible. The specification of them is required in our practice, in cases where the purpose itself of the alleged conspiracy is not criminal or unlawful, in order that it may appear that the means contemplated to carry it out are criminal or unlawful. According to the practice in England, as we gather from the course of the decisions, it is not necessary to set out the contemplated

means for effecting the cheat. *Rex* v. *Gill*, 2 B. & Ald. 204. *Regina* v. *Gompertz*, 9 Q. B. 824. *Sydserff* v. *Regina*, 11 Q. B. 245. *Latham* v. *Regina*, 5 B. & S. 635. But in order to give needed information to the court and to the defendant, where there is merely a general charge of a conspiracy to obtain goods by false pretences, a specification of particulars is ordered by the court, if moved for. *Regina* v. *Kenrick*, 5 Q. B. 49, 61. *Rex* v. *Hamilton*, 7 C. & P. 448. *Regina* v. *Brown*, 8 Cox C. C. 69. In Massachusetts, as in others of the United States, it is held that this information should be given in the indictment, in cases where the purpose of the conspiracy itself does not appear to be criminal or unlawful; and that this rule applies to conspiracies to cheat, as cheating is not necessarily criminal or unlawful. *Commonwealth* v. *Hunt*, 4 Met. 111. *Commonwealth* v. *Eastman*, 1 Cush. 189, 224–227. *Commonwealth* v. *Shedd*, 7 Cush. 514. *Commonwealth* v. *Wallace*, 16 Gray, 221. In the case last cited, the reason given is that it enables the court to see the character of the acts proposed to be done in the accomplishment of the purpose of the intended conspiracy, and also apprises the defendant of the facts relied upon to constitute the offence with which he is charged. No case is cited or has come to our notice where it has ever been held that it is a variance if some of these contemplated means are not proved as alleged, provided any criminal or unlawful means which are alleged are proved. At *nisi prius*, in England, it was held that a charge of a conspiracy " to prevent the workmen of the said J. G. from continuing to work " was well supported by evidence of a conspiracy to prevent one workman. *Rex* v. *Bykerdike*, 1 Mood. & Rob. 179. So also, that a charge of a conspiracy by false pretences to extort money was supported by evidence of a conspiracy to extort money without reference to the false pretences. *Regina* v. *Yates*, 6 Cox C. C. 441. Also, that if an act is charged to have been done with several intents, proof of one is enough. *Rex* v. *Evans*, 3 Stark. N. P. C. 35. We think the substance of the issue is sufficiently proved by proving any one of the pretences laid, provided such pretence would be sufficient if it alone had been charged. The mentioning of the various false pretences is rather a matter of enumeration than of essential description, and those pretences not proved to have been contemplated may be rejected in the indictment.

There certainly was evidence tending to support the averment as to a part of the pretences set forth in the third and fifth counts, and that is enough.

The defendant Meserve further contends that the averment in the third count was of a pretended contract with the Shreve, Crump, and Low Company, which did not bind Brown. We do not so understand it. The averment means, a contract which it was pretended was between a man by the name of George Brown and the corporation, when the contract in fact was between Kennedy and the corporation.

It is also urged that there was a variance because the averment was of a conspiracy to obtain goods, whereas the proof, if anything, was of a conspiracy to obtain goods and labor. But this is no variance. *Veazie's case,* 7 Greenl. 131.

It is further contended that there was no evidence to connect Meserve with the fifth count. If there was evidence of a conspiracy to obtain certain goods by cheating some one, it would take but slight additional evidence to show that Bailey was the one intended. There was a good deal of evidence tending to show that it was the purpose of Meserve and Foye to obtain goods of that kind; and there was evidence tending to show that Meserve offered to settle Bailey's claim by submitting to a loss. This objection would be proper to be considered on a motion for a new trial, but on exceptions we cannot say that there was no evidence for the jury.

We now come to the criticisms made by the defendants upon the judge's charge to the jury.

The first criticism is not well founded. It is, that the court so framed its language that the jury must have been led to think that the inquiry for them was whether a pretence was in fact made that Kennedy was Brown, and not whether there was an agreement to make a false use of that name. But conspiracy may be proved by circumstantial evidence, and proof of what was actually done is evidence tending to show what was agreed to be done. The judge had already fully and clearly instructed the jury as to the proper effect of proof of acts done, and there is no reason to suppose that the jury were under any misapprehension. The defendant now contends that the jury should have been instructed, in substance, that if Kennedy had gone by the

name of Brown before, and had not assumed the name of Brown in this particular instance for fraudulent purposes, such assumption and representation would not be a false pretence. In reference to this, it is enough to say that no such instruction was asked for at the trial.

The same remark applies to other criticisms. No specific instructions were asked for, provided the case was to go to the jury. The judge's attention was not called to any particular defect or insufficiency or inaccuracy in his instructions to the jury, but at the close of the charge the defendants enumerated twenty different portions of the charge to which they excepted, embracing all the four counts which were submitted to the jury, but with no further specification of what they complained of, or wherein they wished for different rulings. Now, in such a case, if any fundamental error in principle is discovered, or anything by means of which it seems probable that injustice may have been done, the defendants should have the benefit of it. But under such circumstances it would hardly conduce to a due administration of justice to search out opportunities for making minute verbal criticisms of the language of the charge, or to look for omissions to say all that might properly have been said. It is incumbent on a defendant who takes his exceptions in this manner, without having made any specific requests for instructions, and without calling the attention of the court to the points relied on further than to allege a general exception to the specified portions of the charge, to make it plain that there has been some substantial error. But we find nothing of the kind in the case before us. Indeed, even after argument, some of the criticisms are difficult to be understood. We discover no exception to the charge as to the third count, which we think ought to be sustained.

In the fifth count, one of the false pretences set forth as contemplated in the alleged conspiracy was, that " Kennedy, so to be represented as George Brown as aforesaid, had recently theretofore sold seven thousand dollars' worth of real estate . . . in said State of New Hampshire, and had invested the proceeds thereof in property in said Boston." The judge instructed the jury that this was good if proved as charged. The ground of objection urged by the defendants is, that this was a representation or pretence as to Kennedy's means or ability to pay, which

must be in writing under the Pub. Sts. c. 203, § 59. The judge had already instructed the jury fully, in reference to the first count, that pretences that he was rich, that he owned real estate in New Hampshire, that this real estate was valuable, and that he was interested in the manufacture of bricks in New Hampshire, were of such a character that they must be in writing; but that a representation that he was shifting his property from New Hampshire to Massachusetts might have another aspect, and that it might be found to be equivalent to a representation that he was so engaged in such transactions that he had occasion for the goods which he sought to obtain. The instruction now objected to was in effect a brief repetition of what had been said before in reference to the various pretences set forth in the first count, and must have been understood as subject to the same qualifications which had already been fully explained. The pretence in question was not merely a pretence as to Brown's means or ability to pay, but it was a pretence which might well be considered to relate to the situation of the property, and his purposes in reference to it, so as to be relevant to the alleged conspiracy to cheat.

*Exceptions overruled.*

## MEMORANDUM.

On the fourth day of June, 1891, the Honorable WILLIAM ALLEN died at his residence in Northampton, having held the office of an Associate Justice of this Court from the fifth day of September, 1881.

BERTHA BADENFELD *vs.* MASSACHUSETTS MUTUAL
ACCIDENT ASSOCIATION.

Suffolk.   January 13, 1891. — June 10, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, & MORTON, JJ.

*Accident Insurance — Arbitration — Condition Precedent — Burden of Proof.*

Under the proviso in a certificate of insurance against bodily injuries, that "no suit
or proceeding at law or in equity shall be brought to recover any sum herein,
unless the same has been first referred to the arbitration of just and competent
men," such an arbitration is not a condition precedent to a right of action upon
the certificate.

In an action upon a certificate of membership in an accident association, contain-
ing provisos that "members are required to use all due diligence for personal
safety and protection," and that no claim should be made under the certificate
"when death or injury may have happened in consequence . . . of any vol-
untary exposure to unnecessary danger," the burden of proof is on the defend-
ant to show that the assured did not use such due diligence, or that he did thus
expose himself to such danger.

At the trial of an action upon such a certificate, there was evidence that the as-
sured before ten o'clock A. M. was waiting in a railroad station to take a train
leaving at a quarter past ten from track No. 7 ; that on the adjoining track No. 8,
next the wall of the building, stood a train which he knew left at ten ; that be-
tween these tracks was a platform for the use of passengers taking and leaving
trains ; that outside of track No. 8 and next the wall was a narrow platform
overhung by the train and cut into by girders projecting from the wall, intended
for the use of train hands, though sometimes used by passengers ; and that just
after the ten o'clock train had started, the body of the assured was found on
track No. 8 next to the edge of the outside platform, in such a situation and
condition as showed that he had been run over by the train and instantly killed.
There was no evidence of the cause of his fall or of his acts proximate to his
death.   The presiding judge refused to rule that, if the assured was on the out-
side platform or leaving the train while it was in motion, a defence was made
out, on the ground that the assured did not use due diligence, or had voluntarily
exposed himself to unnecessary danger.  *Held,* that the defendant had no ground
of exception.

CONTRACT, by the administratrix of the estate of Charles
Badenfeld, to recover five thousand dollars on a certificate of
membership in the defendant association issued to the intestate,
who was the husband of the plaintiff.   The certificate contained,
among other provisions not material, the following:  " In the
event said member shall sustain during the continuance of his
membership bodily injuries effected through external, violent,
and accidental means, within the meaning of the conditions

herein recited, and such injuries alone shall have occasioned death within ninety days from the happening thereof, then we agree to pay to his wife, Bertha Badenfeld, if surviving, or, if not surviving, to his heirs or legal representatives, five thousand dollars, . . . provided always, First, members are required to use all due diligence for personal safety and protection. . . . Fifth, . . . no claim shall be made under this certificate . . . when death or injury may have happened in consequence . . . of any voluntary exposure to unnecessary danger. . . . Ninth, no suit or proceeding at law or in equity shall be brought to recover any sum herein, unless the same has been first referred to the arbitration of just and competent men."

At the trial in the Superior Court, before *Pitman*, J., it appeared in evidence that the intestate came to his death in the train-house of the Boston and Lowell Railroad Station in Boston, on December 26, 1888. It was admitted that there had been no reference to arbitration of the plaintiff's claim, either as regards the amount thereof, or as to the question of the liability of the defendant; and that the plaintiff had never requested such arbitration.

There was evidence that the intestate came into the train-house at about half past nine o'clock on the morning of the day of the accident; that in this train-house were numerous parallel tracks for passenger trains, with platforms between extending out of the train-house to the north; that the most easterly track was called track No. 8, and the track next westerly, and separated from it by a platform, was called track No. 7; that between track No. 8 and the easterly wall of the train-house was a platform, over which a car standing on the track would extend about six inches; that projecting from such easterly wall were iron girders twenty-five feet apart and supporting the roof, which rendered this platform of varying width, being about five and a half feet in the clear between the edge of the same and the wall itself, but only about two and a half feet where the girders projected into the platform, thus leaving a space of about two feet only between the side of a passenger car standing on the track and the face of the girders; that this platform was intended for the use of train hands, and not for that of passengers, though sometimes used by the latter; that the platform

intended for the use of passengers, and which was generally used by them in getting upon or in alighting from cars standing on track No. 8, was the platform between that track and track No. 7.

There was further evidence that the intestate came into the train-house alone, and inquired of the gateman at one of the gates through which passengers went in going to and from the cars, respecting the trains for East Cambridge, and was told that the next train for that point left at a quarter past ten from track No. 7; that he at the same time showed the gateman a ticket for a single passage between Boston and East Cambridge; that the quarter past ten train had not yet backed into the train-house, and the only train then standing in the train-house was one standing on track No. 8, which was due to leave at ten o'clock A. M.; that the intestate, upon being told that the train then standing on track No. 8 left at ten o'clock, asked the gateman whether that train did not stop at East Cambridge, and was told that it did not; that the intestate then proceeded to walk about the train-house, and up and down the platforms between the tracks, and was last seen by the gateman at about a quarter before ten o'clock, when the intestate accosted him; that the ten o'clock train was made up of two passenger cars, the forward one of the two being a smoking car; that upon the departure of the ten o'clock train, and as soon as the rear end of the rear car had passed along, the gateman saw the intestate lying dead upon track No. 8, his head lying upon the westerly or left hand side of the more easterly rail nearly severed from the body, and the rest of the body crowded in between that side of the rail and the edge of the outside platform; that at the time the train started, the intestate was not upon the rear platform of the smoking car, or upon either platform of the rear car; and that, as this train stood in the station, the forward platform of the smoking car was about twenty feet from the point upon the track where the body of the intestate was found. There was no evidence that the intestate was seen by any one after he spoke to the gateman, about a quarter before ten o'clock, and no evidence of the cause of his falling upon the track and in front of the car wheels, which passed over him and occasioned his death.

At the close of the plaintiff's evidence, and also at the close of the defendant's evidence, the defendant requested the judge to nonsuit the plaintiff, on the ground that, there having been no arbitration or request for arbitration, the present action could not be maintained; but the judge refused to do so, and the defendant excepted. The defendant also requested the judge, at the close of all the evidence, to direct a verdict for the defendant, which the judge also refused to do, and the defendant excepted. The defendant also requested the judge to give the following instructions to the jury:

"1. That, upon all the evidence in the case, the plaintiff is not entitled to maintain the present action. . . .

"3. That if the jury find that the deceased, while on the platform on the right of track No. 8, fell, or was struck by the moving train and knocked under the car, the plaintiff is not entitled to recover in the present action.

"4. That if the jury find that the deceased attempted to get off the train while in motion, and in so doing fell or was knocked under the car, then the plaintiff is not entitled to maintain the present action.

"5. That if the jury find that the deceased, while being on the platform above mentioned, had a fit or illness of any kind and fell under the car, then the plaintiff cannot recover in the present action.

"6. That the deceased, in being on the platform in question, was not using all due diligence for personal safety and protection.

"7. That if the jury find that this platform on the right of track No. 8 was obviously not intended for the use of passengers, and was obviously a dangerous place, then the deceased was not in the exercise of all due diligence for personal safety and protection ; and if the jury find that the deceased, while being on such platform, by reason of illness or otherwise, fell or was struck by the moving train and knocked under the car, then the plaintiff cannot recover in the present action.

"8. That if the jury find that the deceased voluntarily placed himself in a position of danger, and his death occurred in consequence thereof, the plaintiff cannot recover."

The judge refused to give these instructions, but instructed the jury, among other things, as follows:

" Did the deceased meet his death in a careless way ? that is, with a lack on his part of due diligence ? Of course that renders it necessary to discuss somewhat and to apply the law somewhat to hypothetical cases." The judge then read the defendant's seventh request. " I cannot give you that instruction in the way in which it is asked. I cannot rule to you, as matter of law, that the finding of the party upon that platform, whatever you may think of the situation of the platform, or its use or intended use, necessarily, as matter of law, proves that the party was not in the exercise of due care. Of course, if you find that that platform was not intended and not prepared for the use of passengers, and did not present any invitation to passengers, and was obviously a dangerous place, then the law would impose upon him a different measure of care when he was in such a dangerous place than the rule of due diligence would impose upon him if he was in a safe place, and it may be that the jury would be justified in finding, if he was there unnecessarily and improperly, with no excuse or reason for being there, that that act constituted a lack of proper care. But, on the other hand, I cannot say that you may not find in the case — it is not for me to say whether you can or cannot — reasons or excuses for his being there which would be consistent with the exercise of due care in being in that place, notwithstanding the contingencies and dangers named in the prayer. I must therefore leave that to you upon this consideration." The judge then read the eighth request of the defendant. " I give you that instruction, with this qualification : ' If the deceased voluntarily placed himself in a position of danger, without any reasonable excuse therefor, then the plaintiff cannot recover.' The other prayer which I shall give you [the fourth] relates to his leaving the train, upon the suggestion that he left the train while it was in motion ; and the law upon that matter I may as well give in the exact language of the Supreme Court." The judge then quoted the opinion in *Gavett* v. *Manchester & Lawrence Railroad*, 16 Gray, 501, 507, beginning at the words, " It cannot be doubted," and ending with the words, " evidence of carelessness"; and then proceeded : " It will be for you to say, if you reach this part of the case, whether the defendant, upon all the evidence and upon all the circumstances of the case, has satisfied you, as in other

civil cases, so that you can feel that degree of assurance that you would act upon in a business matter, — has made it so probable that you would say, speaking in a business way, that you were satisfied that the deceased was not in the exercise of due diligence. Of course, you are not required to be sure of it, but only to be satisfied by a fair preponderance of the evidence. If it is left in such a state that you cannot be satisfied, then the defendant has failed in its attempt to make out that defence. To recapitulate. You will first determine whether this is a case of accidental death, or a case of suicide, the burden being upon the plaintiff in that. If you decide that in favor of the plaintiff, you will then decide whether the deceased was in the exercise of due diligence; or rather, more exactly, whether the defendant has proved that he was not in the exercise of due diligence. If you find either of these propositions as the defendant contends, then the defendant is entitled to your verdict; if you find them both as the plaintiff contends, then your verdict will be for the plaintiff for the amount which I have indicated."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*F. E. Snow*, for the defendant.

*A. A. Ranney & J. Woodbury*, for the plaintiff.

BY THE COURT. This opinion, prepared by Mr. Justice William Allen, was approved by the court in his lifetime.

The promise of the defendant was to pay a certain sum in the event of the death of the plaintiff's intestate, occasioned by "bodily injuries effected through external, violent, and accidental means."

There are nine provisos in the certificate, the last of which is, that "no suit or proceeding at law or in equity shall be brought to recover any sum herein, unless the same has been first referred to the arbitration of just and competent men." It was admitted that there had been no reference to arbitration of the plaintiff's claim, and that the plaintiff never requested such arbitration. The first exception is to the refusal of the court to rule that, for that reason, the action could not be maintained. The promise is, not to pay the award, but to pay the sum named, and the proviso does not make the award a condition

precedent to the promise to pay, but a mode of enforcing that promise. It is well settled that such an agreement is no bar to an action on the promise. *Reed* v. *Washington Ins. Co.* 138 Mass. 572, and cases cited.

The certificate also contains the provisos, that "members are required to use all due diligence for personal safety and protection," and that "no claim shall be made under this certificate . . . when the death or injury may have happened in consequence . . . of any voluntary exposure to unnecessary danger." These provisos constitute matter of defence, and the burden of proving them is upon the defendant. *Freeman* v. *Travelers' Ins. Co.* 144 Mass. 572. The other exceptions are to the refusals of the court to rule upon the undisputed evidence in the case, and upon the hypothetical findings of the jury upon the evidence, that the defence of want of due diligence or of voluntary exposure to unnecessary danger by the deceased was made out, and to instruct the jury to find a verdict for the defendant.

After the ten o'clock train left, the dead body of the plaintiff's intestate was found on the track where the train had stood, in such a situation and condition as showed that he had been run over by the train and instantly killed. Track No. 8 was the easterly track, and was near the easterly wall of the train-house. A platform extended from the wall toward the track so far that a car upon the track would overhang the platform about six inches. The distance from the wall to the edge of the platform was about five and a half feet, but there were girders extending inward from the wall about three feet, so that the distance from the face of the girders to the edge of the platform was about two and a half feet. There was evidence tending to prove that the plaintiff's intestate, before ten o'clock in the forenoon, was waiting in the train-house of a railroad station in Boston to take a train that left at a quarter past ten on track No. 7, and that he knew that a train left on track No. 8 at ten o'clock.

The defendant contended, and there was evidence to prove, that the platform east of the tracks was intended for the use of the train hands, and not for passengers, though it was sometimes used by them, and that the place intended for and generally used by passengers for taking and leaving cars on track

No. 8 was the platform on the westerly side of that track, between it and track No. 7.

The supposition that the deceased fell in attempting to get on or off any platform of the cars while they were in motion, seems inconsistent with the evidence.   The only theory of accidental injury consistent with the evidence seems to be that the deceased was thrown or fell from the platform east of the cars upon the rail between the front and rear trucks of the forward car, about the time the cars started, and before they had moved twenty feet.   There was no evidence of the cause of his fall, and it cannot be contended that the mere fact that he fell under the car is a defence.   The real contention of the defendant, expressed in different forms in its prayers for instructions, is that the mere fact that the deceased was in a dangerous place, (on the platform east of the track,) or, as stated in one prayer for instructions, doing a dangerous act, (leaving a car while it was in motion,) is, as matter of law, conclusive proof that he did not use all due diligence for personal safety and protection, and that he voluntarily exposed himself to unnecessary danger.

This is not an action against the railroad company in which the mutual rights and duties of a person injured and the company are involved.

As regards the defendant, the deceased had a right to go upon the platform, and to examine the wall of the building, and the girders, and the platform, and the cars standing upon the track, and to enter and leave them.   None of these acts would of itself be evidence of want of due diligence for personal safety, or of voluntary exposure to unnecessary danger.   Any of them might be done carefully or carelessly.   The manner and circumstances of the act would give character to it.

The facts that the deceased was upon the platform, and that he was injured in the manner shown, clearly do not constitute negligence in law, or afford conclusive evidence of negligence.

The defendant asked for instructions upon the hypothesis that the deceased fell while leaving the car when it was in motion. There was no evidence that he so fell, but, if it could be inferred, it would not be conclusive of his negligence.   That would depend upon the circumstances, and there would be no presump-

tion that the circumstances were such as to make it negligent. If the jury could surmise that he left the car when it was in motion under circumstances which rendered the act negligent, they could equally well surmise that he left it under circumstances which would show that the act was not negligent. It may be said, in general, in regard to each of the defendant's prayers for rulings and instructions, that there is no evidence of the act of the deceased proximate to his injury, and of course no evidence of the circumstances which characterize the act as negligent or otherwise. If the jury infer an act, they are not, without evidence, at liberty to infer the circumstances which made the act negligent. The jury could not properly base their verdict upon particular facts found without evidence. The real question was whether the facts directly proved by the evidence, and those to be inferred from them, sustained the burden of proof which was upon the defendant, and this was clearly a question for the jury and not for the court, unless the court could rule that there was not sufficient evidence. The instructions given were sufficiently favorable to the defendant.

*Exceptions overruled.*

## MEMORANDUM.

ON the eighteenth day of June, 1891, the Honorable JAMES MADISON BARKER, one of the Justices of the Superior Court, was appointed a Justice of this Court, in place of Mr. Justice William Allen, deceased, and took his seat upon the bench on the twenty-sixth day of the same month, at a session of the full Court then held at Boston in the county of Suffolk.

PATRICK J. MᶜGUINNESS vs. PHILIP SHANNON.

Worcester.   March 20, 1891. — June 25, 1891.

Present: ALLEN, HOLMES, KNOWLTON, MORTON, & LATHROP, JJ.

*Written Contract — Oral Agreement.*

In an action to recover a balance due for building a house for a fixed price, under a written contract which did not require the plaintiff to do the papering, the defendant sought to deduct a sum paid by him for doing the same under a new agreement, which he contended became a part of the written contract; but the only evidence thereof was his testimony that he told the plaintiff, after the execution of the contract and before they separated, that "there was on the back of the paper, written on with pencil, there was fifty dollars to be allowed for papering," and that the plaintiff said he understood it. *Held*, that the alleged agreement was to be treated as an oral agreement made substantially at the same time, which was inconsistent with the written contract and could not have the effect to vary it.

CONTRACT to recover a balance due under a building contract. Trial in the Superior Court, before *Blodgett*, J., who ruled, against the defendant's objection, that a certain claim of the defendant could not be sustained upon evidence introduced by him, and directed the jury not to consider it; and, after a verdict for the plaintiff, the defendant alleged exceptions. The nature of the claim and the evidence appears in the opinion.

*F. A. Gaskill*, for the defendant.

*W. A. Gile*, for the plaintiff.

ALLEN, J.   The plaintiff built a house for the defendant for a fixed price, under a written contract and specifications which did not require him to do the papering; and he now sues to recover the balance due therefor.   The defendant seeks to deduct fifty dollars, that being the sum paid by him for papering the house.   To sustain this claim of deduction, he offered evidence tending to show that on the day when the contract was executed, and before the parties separated, the plaintiff orally agreed to do the papering also, or to allow the defendant fifty dollars for doing it.   The defendant now contends that there was some evidence that this new agreement became a part of the written contract; but there is nothing to support this contention except the defendant's testimony that he told the plaintiff, " There was

on the back of the paper, written on with pencil, there was fifty dollars to be allowed for papering," and the plaintiff said he understood it.  There is nothing to show that the writing itself, if any there was, was before the court, or what the words written really were.  The whole effect of the defendant's testimony is merely that the plaintiff agreed to the new provision orally, and not that it was mutually understood that a new clause, written on the contract, should be deemed to be incorporated into it as a part of the written contract.  We cannot think that this view, which is now suggested in argument, was presented to the judge at the trial, especially as no copy of the memorandum is furnished and the defendant's testimony itself is so very vague.  Indeed, looking at it narrowly, he did not even testify that there was in fact such a memorandum, but only that he told the plaintiff that there was.  It must therefore be treated merely as an oral agreement, which was inconsistent with the written agreement, and was made substantially at the same time, and it cannot have the effect to vary it.  It was not an alteration of the written contract by a subsequent new oral agreement between the parties, and in this respect it closely resembles *Clark* v. *Houghton*, 12 Gray, 38, 41.  See also *Doyle* v. *Dixon*, 12 Allen, 576; *Fitz* v. *Comey*, 118 Mass. 100; *Frost* v. *Brigham*, 139 Mass. 43.                    *Exceptions overruled.*

---

WILLIAM RAND *vs.* HATTIE F. HANSON.

Essex.   November 5, 1890. — June 25, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON,
& LATHROP, JJ.

*Judgment recovered in another State — Service — Agreed Statement — Inference of Fact — Practice.*

The presumption in favor of the validity of a judgment rendered in another State does not extend to a case where it appears from the record that the defendant was not a resident of that State, and it does not appear that service of process was made on him there.

An order of notice, issued by the Supreme Court of New Hampshire, recited that the defendant in an action brought therein was not a resident of that State, and

directed service upon him by publication, or by giving him a copy in hand, or by leaving it at his last and usual place of abode; and the officer's return thereon recited that he gave to the defendant such a copy, but did not disclose where he did so. In an action brought here on a judgment subsequently recovered there, an agreed statement of facts, which contained a stipulation that inferences of fact might be drawn, recited only that the order was served " either in New Hampshire or Massachusetts," without more. *Held*, that it did not appear that there was service of process on the original defendant in New Hampshire, and that the judgment must be treated as invalid.

*It seems* that, if it is desired to present to the full court the question of law whether an agreed statement of facts will warrant a particular inference of fact, it can best be done by an exception taken at the hearing.

CONTRACT, against the administratrix of the estate of Sarah E. Hanson, on a judgment recovered against the intestate in New Hampshire. The case was submitted to' the Superior Court, and, after judgment for the plaintiff, to this court, on appeal, on agreed facts, in substance as follows.

On October 25, 1877, the plaintiff, a resident of Rochester, New Hampshire, began an action in the Supreme Court of that State against the intestate, who was a resident of Haverhill in this Commonwealth, by a writ returnable to the February term of 1878 of that court. The intestate was not in New Hampshire at the date of the writ, or between that date and fourteen days before the return day. The return upon the writ recited an attachment of all the real estate in Rochester, " in which the within named defendant has any right, title, interest, or estate," but at the time of the alleged attachment the intestate had no estate in New Hampshire except an unassigned right of dower in certain land in that town. The writ was duly entered, and during that term the court issued an order of notice, which, after reciting the declaration and the attachment, and the absence of personal service on the intestate, " she not being a resident of this State at the time of the service thereof," directed the plaintiff to give notice to the intestate of the pendency of the action, by publication, or by giving a copy of the order containing the substance of the declaration to her in hand, or by leaving it " at her last and usual place of abode " within a time limited. The officer's return upon this order recited that he " gave to the within named defendant a copy of the within declaration and order," without more. This order was personally served upon the intestate, either in New Hampshire or in Massachusetts, and no other

service was made upon her, and she did not appear in the action either personally or by attorney. Subsequently the plaintiff recovered judgment against her, no part of which has ever been paid or satisfied. The agreed statement of facts contained the following: " It is agreed that the court may draw proper and competent inferences of fact from the above agreed facts."

If the plaintiff was entitled to recover, judgment was to be entered for him for a sum agreed; otherwise, judgment was to be entered for the defendant.

Ths case was argued at the bar in November, 1890, and afterwards was submitted, on the briefs, to all the judges except *Barker*, J.

*W. H. Moody*, for the defendant.

*I. E. Pearl*, for the plaintiff.

KNOWLTON, J. The judgment rendered against the defendant's intestate by the Supreme Court of New Hampshire was void for want of jurisdiction, unless a proper process was served on her in that State. *Eliot* v. *McCormick*, 144 Mass. 10. *Needham* v. *Thayer*, 147 Mass. 536. *Pennoyer* v. *Neff*, 95 U. S. 714. *Eaton* v. *Badger*, 33 N. H. 228. There is a presumption in favor of the regularity of the proceedings of any court of general jurisdiction. *Bissell* v. *Wheelock*, 11 Cush. 277. *Stockwell* v. *McCracken*, 109 Mass. 84. But it is always a good defence against a suit brought on a judgment recovered in another State, to show that the defendant was not a resident of that State, and that no proper service was made on him there. The presumption in favor of the validity of a judgment does not extend to a case where it appears from the record that the defendant was a non-resident, and it does not appear that service of process was made upon him within the State. *Downer* v. *Shaw*, 22 N. H. 277. *Morse* v. *Presby*, 25 N. H. 299. In *Galpin* v. *Page*, 18 Wall. 350, it is said that " where the special powers conferred are exercised in a special manner, not according to the course of the common law, or where the general powers of the court are exercised over a class not within its ordinary jurisdiction upon the performance of prescribed conditions, no such presumption of jurisdiction will attend the jurisdiction of the court. The facts essential to the exercise of the special jurisdiction must appear in such cases upon the record."

The facts agreed by the parties, and the facts disclosed by the record itself, show that the court had no jurisdiction of the defendant's intestate when the order of notice was issued at the February term in 1878. The record showing that there was no jurisdiction without a service of this order upon her in New Hampshire, the question arises whether the agreed statement shows that the order was served there, or whether there is any evidence in the case which, under the stipulation in the agreement that the court may draw inferences of fact, would warrant the Superior Court in making a finding to that effect. Unless this question can be answered in the affirmative, the judgment must be for the defendant. The order of notice directed a service, either by publication, or by giving a copy in hand to the original defendant, or by leaving it at her last and usual place of abode. It did not require or contemplate a personal service in the State of New Hampshire, but treated a service by leaving a copy at her place of abode in Massachusetts, or by giving it in hand to her there, as of equal effect with a personal service within the jurisdiction of the court.

The fact that the order was served, "either in New Hampshire or Massachusetts," has no tendency to prove that it was served in New Hampshire rather than in Massachusetts. The return of the officer, that he gave the defendant a copy, is entirely silent in regard to the place where the copy was put into the possession of the original defendant, and it has no affirmative force in favor of the proposition which must be established before the judgment can be treated as valid. Nothing is agreed upon outside of the record from which an inference of fact can be drawn in regard to the place where the service was made, and there is nothing in the record itself which furnishes a foundation for such an inference. If the order of notice called for a service within the State, there might be a presumption of regularity in favor of the service, although the language of the return was as consistent with a delivery of the copy in Massachusetts as in New Hampshire. But the order assumed that no personal service within the jurisdiction was necessary to the judgment which was contemplated, and it would have been complied with as well by leaving a copy at the place of abode of the original defendant in Haverhill, or by deliv-

ering it to her in hand there, as by a personal service in New Hampshire.

We find nothing in the case to make the stipulation in the agreed statement, that the court may draw inferences of fact, of any importance. Upon the material point there is nothing but the question what is the true legal construction of a record, which is always a question of law for the court. We therefore have no occasion to determine whether we should further approve the practice which has sometimes been permitted of presenting to the court certain agreed facts as a case stated, accompanied by a stipulation that the court may draw any proper inferences of fact, and then asking the full court to treat, as a question of law apparent on the record, the question whether the facts agreed will warrant an inference of fact that will support the judgment appealed from, on the assumption, without proof, that the court below drew the strongest inferences of fact possible in favor of the result reached. It is clear that such a statement is not like a special verdict, and is not a proper case stated, because it can never be known from the record whether the court below drew any inferences of fact or not. If it is desired to present to the full court the question of law whether the facts agreed will warrant a particular inference of fact, it can best be done by an exception taken at the hearing. See *Hovey* v. *Crane,* 10 Pick. 440; *Commonwealth* v. *Cutter,* 13 Allen, 393; *Charlton* v. *Donnell,* 100 Mass. 229; *Keegan* v. *Cox,* 116 Mass. 289; *Atlantic National Bank* v. *Harris,* 118 Mass. 147; *West* v. *Platt,* 120 Mass. 421; *Powers* v. *Provident Institution for Savings,* 122 Mass. 443; *Fitzsimmons* v. *Carroll,* 128 Mass. 401; *Old Colony Railroad* v. *Wilder,* 137 Mass. 536; *Mayhew* v. *Durfee,* 138 Mass. 584; *Hecht* v. *Batcheller,* 147 Mass. 335, 339.

In deciding the case on the ground that the plaintiff has failed to show that service was made in New Hampshire, we do not intimate that the court there had jurisdiction, in the absence of a valid attachment of property, to issue a process requiring the defendant to answer in that State, or that the judgment would be good if service of the order had been made there.

*Judgment for the defendant.*

GLOUCESTER ISINGLASS AND GLUE COMPANY *vs.* RUSSIA
CEMENT COMPANY.

Essex.   November 5, 1890. — June 25, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON,
& LATHROP, JJ.

*Contract — Restraint of Trade — Public Policy — Failure of Consideration —
Specific Performance — Adequate Remedy at Law.*

An agreement between manufacturers, for the purpose of avoiding competition
and regulating prices, respecting a valuable product not of prime necessity or a
staple commodity, manufactured by both by the same process out of a nearly
worthless material of which there is a limited supply, is not void as against
public policy.

An agreement between manufacturers, an important part of the consideration of
which is a compromise of litigation respecting the infringement of a patent sup-
posed by them to be valid, which is entered into for the purpose of avoiding
competition and contains mutual covenants as to the mode of conducting their
business, will not, on a bill for specific performance of the agreement, after a
partial performance of the same and upon the patent's proving invalid, be
treated so far as it is executory as void for want of consideration, where the
parties, after discovering the invalidity of the patent, by their conduct affirm
and renew the agreement.

If the non-performance by one of the parties to an agreement between manufac-
turers, who are both engaged in producing an article from material of which the
supply is limited, will result in a continuing injury leading to difficulties in the
management of the other's business, and possibly to its destruction, by depriv-
ing him of the share of such material to which the agreement entitles him, the
latter has no adequate remedy at law, and specific performance will not be
denied him on that ground.

Specific performance of a contract, which has been varied in the execution of
its details by a common understanding and mutual consent, may be decreed
with such variation, if the rights of the parties are clear under the modified
agreement.

BILL IN EQUITY, for the specific performance of an agree-
ment between the plaintiff and the defendant.   Hearing before
*Knowlton,* J., who reported the case for the consideration of the
full court, such decree to be entered as law and equity might
require.   The facts appear in the opinion.

The case was argued at the bar in November, 1890, and af-
terwards, in June, 1891, was submitted on the briefs to all the
judges, except *Barker,* J.

*C. Browne*, for the plaintiff.

*P. E. Tucker & C. H. Drew*, for the defendant.

KNOWLTON, J. The plaintiff and the defendant corporations, which had been engaged in litigation with each other as to the alleged infringement of a patent owned by the plaintiff, supposing the validity of the patent fully established, and believing that they would be able practically to control the profitable manufacture of fish glue, entered into a contract with each other by which the defendant was to pay a certain sum for damages, and one half of the costs of the suits, and was to be allowed the use of the patent. Each party was to conduct its own establishment, and they were to unite in the purchase of fish skins, an article of which the supply was limited and from which the fish glue is manufactured, so that there should be no competition between them. The plaintiff was to fix the price of all skins purchased, and the parties were to have certain places assigned to them by two persons named, of which they were respectively to have the product. From the proprietors of certain other places mentioned the defendant was to have the entire product, and to allow the plaintiff to receive from it one third thereof, and the two parties were to divide equally between them the skins which might be obtained from new producers. They were both to sell the glue at the same price, to be agreed upon from time to time, and the contract contained other stipulations the effect of which was to prevent competition between them. The contract was made in February, 1884. After they had conducted the business in this manner until early in 1887, it became evident to both that the patent was invalid, although no formal judgment was rendered declaring it so. Thereupon, Brooks, the manager of the defendant company, made a large number of what are known as the long term contracts, for the purchase of all skins to be produced until the year 1900, with nearly all the producers of fish skins known to the parties. The plaintiff received its share of these skins, and no difficulty arose between the two companies until early in July, 1890, when the defendant notified the producers of skins by whom the plaintiff had been supplied up to that time not to deliver it any more skins, and also notified the plaintiff of its abandonment of the contract. Until then the parties had gone along under the contract as modified by mutual

consent, and no intimation had been given the plaintiff of any intention to abandon it. The object of the bill is to compel the defendant to permit the plaintiff to obtain directly from the producers, or through the defendant, what it deems its share of the fish skins. The defendant rests its defence on several grounds. It contends that the contract as originally made was void as contrary to public policy; that it cannot be enforced, because, the patent being invalid, there was no sufficient consideration for it; that, if it is binding, the plaintiff has a complete and adequate remedy at law; that, if the plaintiff is entitled to any relief at all, it should be compelled to take its proportion of the waste received by the defendant under the long term contracts with third parties; and finally, that, if the plaintiff had a right to specific performance of the contract, it has lost it, by reason of its own conduct, and the conduct of the defendant to which it has assented since the original contract was made.

The original purpose of the contract was to regulate the business of manufacturing a product under what was supposed to be a new invention, on which letters patent of the United States had been issued, whereby an article then nearly worthless might be converted into an article of large value. The use to which the fish skins were put under this invention gave them their market value. The plaintiff and the defendant sought to unite with each other in the purchase of the raw material, so that they might not be tempted to overbid each other and thus to raise it to an unreasonable price, and also to agree on the price at which the manufactured article should be sold, so that they might be secure in a reasonable profit. Even if they hoped for gain by their joint exertions, or by the possession of a patent as to the value of which they were subsequently disappointed, their contract had no relation to an article of prime necessity, or to staple commodities ordinarily bought and sold in the market, but to a particular article, of which both were manufacturers under the same process, and to an article used in the manufacture which was of little value for any other use. That the agreement was not obnoxious to the objection made by the defendant is shown by the case of *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353.

The next inquiry is whether the contract is incapable of en-

forcement for want of consideration.  If there were no consideration for it but a transfer of an interest in a void patent, it would be invalid.  *Nash* v. *Lull*, 102 Mass. 60.  *Harlow* v. *Putnam*, 124 Mass. 553.  The parties had been engaged in extended litigation involving several suits.  As between them and for that litigation the validity of the patent had been established by a decision of the Circuit Court of the United States ; and a judgment for damages in favor of the plaintiff against the defendant was about to be rendered.  An important part of the consideration of the contract was a compromise and adjustment of the controversy which had taken form in the suits then pending, and a liquidation of the damages which the plaintiff was about to recover under the decision of the court.  Moreover, the parties were competitors in business, and for mutual advantage they entered into mutual covenants as to the mode of conducting their business, and the covenants of each in that particular were a consideration for the covenants of the other.  Before the invalidity of the patent was discovered, they had performed the contract in part, and what each had done in the management of its business was a part of the consideration for what remained to be done by the other.  The belief that the patent was valid was one of the causes of making their agreement, but it was not the consideration of it in any sense in which it can be separated from the other objects and promises which formed a part of the consideration.  Both parties are disappointed in regard to a fact upon which they supposed they could rely, but the contract cannot therefore be avoided, so far as it is executory, when so many other elements entered into it, and when the parties have for a long time been deriving advantage from it, not only in their dealings with each other, but with the public.

If it should be held that the right to use the patent formed so large a part of the consideration for the defendant's undertaking that, after the discovery of the mistake of the parties in this particular, a court of equity would decline to decree specific performance against the defendant if it had seasonably sought to avoid the contract on the ground of mistake, there are reasons why such a defence should not avail the defendant in this case.  After both parties knew that the patent was void, the defendant still chose to avail itself of the benefits of the contract,

and to go on under it. There had been no adjudication that the patent was invalid, and the existence of the patent and of the arrangement under which the plaintiff and the defendant were acting was probably somewhat advantageous to the parties long after they discovered that the patent would not protect them if put to the test of litigation. The report finds that "both parties attempted in good faith to do what the contract called for, and no complaint has ever been made of a breach of any of its provisions by either of them until July, 1890, a few days before the commencement of this suit." In making the long term contracts, Brooks, the defendant's treasurer and manager, acted without the knowledge of the other officers of either of the corporations, in order that he might make the contracts quickly; but it must be inferred that he intended that the plaintiff should have the benefit of them as well as the defendant, so far as might be necessary to carry out in substance the provisions of the contract existing between them. This is apparent from the fact that before buying the skins of the firms of Shute and Merchant, John Pew and Son, and Cunningham and Thompson, he executed another agreement in the name of the defendant corporation, which was professedly a contract for the protection of the plaintiff in regard to the right to purchase skins after the expiration of the agreement between the plaintiff and the defendant, and until the year 1900. Perkins, who was president of the plaintiff corporation, and who controlled the sale of the skins and waste of the above mentioned firms, would not consent to a sale of the skins unless the defendant would sign a contract for the protection of the plaintiff after the expiration of the agreement, and it was assumed by both parties that the plaintiff would have the benefit of these purchases, and would need no protection during the continuance of the original agreement. The report recites: "The action of Brooks in buying the skins was afterwards approved and ratified by the officers of both corporations, and the plaintiff has received skins purchased under some of these contracts, and paid for them at the rate of twenty dollars per ton until July, 1890." The action so ratified and approved must be deemed to have been for the benefit of both corporations, at least until the expiration of their original contract. The conduct of the parties was, in effect, an affirmance and renewal of

the contract after the invalidity of the patent was well known. It would be most inequitable to permit the defendant — after having induced the officers of the plaintiff to consent to its purchase of nearly all the skins which would be likely to come into the market for a long term of years, on the faith of an understanding that the plaintiff was to share in the benefits of the purchase — to repudiate the contract, and leave the plaintiff without the means of procuring skins to carry on its business. We are of opinion that, if the defendant might successfully have defended against a suit for specific performance on the ground of the invalidity of the patent if it had sought to repudiate the contract on the discovery of the mistake, it has so far affirmed the contract since that it cannot do so now.

The next objection of the defendant is, that, even if it violates its contract, it is not shown that the plaintiff has not an adequate remedy at law. The only remedy which the plaintiff could have at law would be by a recovery of damages for the failure of the defendant to deliver, or to allow those to deliver with whom it had made contracts in its own name but for the benefit of both, the due proportion of fish skins to the plaintiff. It sufficiently appears that the principal market for them is in Gloucester, that most of the skin producers there are under contract with the defendant, and that fish skins are of very limited production. " If the plaintiff is unable to obtain skins produced by firms which have contracted with the defendant," it is found that " it will be very difficult, if not impossible, for it to carry on its business." This continuing injury, leading to difficulties in the management of the plaintiff's business, and possibly to its utter destruction, is one that could not be measured in damages. It would be practically impossible to estimate the amount of the injury, or to repair it. The plaintiff's property invested in the manufacture must lose a considerable, but uncertain, amount of its value. The injury thus threatened would be practically irreparable. *Florence Sewing Machine Co.* v. *Grover & Baker Sewing Machine Co.* 110 Mass. 1, 11.

It is urged that, if the plaintiff is entitled to any relief at all, it should be compelled to take its proportion of the waste as well as of the skins, including in the computation the waste and skins of George Perkins and Son. In addition to the fish skins,

which were the most valuable product for the manufacture of glue which is left in the business of cutting and packing salt fish, there remain fins, bones, tails, etc., which go by the technical name of waste. A fish glue of an inferior character is made therefrom. As to certain firms, including George Perkins and Son, with whom the long term contracts for fish skins were made by Brooks, it appears that they would not sell the skins unless the defendant would agree to buy the waste also, and pay a fixed price therefor. While the contracts made by Brooks were ratified so far as the purchase of skins was concerned, the plaintiff has neither recognized nor been required to recognize them so far as waste is concerned. The plaintiff does not use waste, nor has it been requested by the defendant to take it. The defendant has manufactured this itself, and it does not appear that such manufacture is unprofitable. The business was thus conducted, and the plaintiff received its allotted portion of skins, from 1887 until July, 1890, when the defendant announced that it should retain all the skins for which it had made contracts. While there had been no formal fixing of prices at which the skins should be bought, this had been substantially arranged between the parties without disagreement, but it nowhere appears that the waste was at any time made the subject of negotiations. In regard to the mode of delivery of the skins, it had been arranged that the plaintiff should receive, as its fair proportion, those contracted for with Tarr and Brother and with Wanson and Company, paying the producers therefor, the charge being made directly to the plaintiff. It was also arranged that the establishment of Shute and Merchant should be allotted to the plaintiff, the charge for the skins produced there being made to the defendant, and the payment being made by the plaintiff to the defendant, and by it to Shute and Merchant. Nowhere was there a suggestion that the plaintiff should pay for waste, although there was a provision for the sale of it in the contract with Shute and Merchant. We are of opinion that the defendant cannot compel the plaintiff to take any portion of the waste. The conduct of the parties is quite conclusive that there was no bargain between them as to this.

The defendant further contends, that, if the plaintiff had a right to have the contract specifically enforced, it has lost it by

its own conduct since the contract was made. It is found that both parties have attempted in good faith to do what the contract called for. The licenses granted by the plaintiff to other parties to manufacture under the patent were assented to by the defendant, two of them by giving certificates under seal, and one orally, by its president and general manager, acting in its behalf. The purchase by the plaintiff at one time of four or five tons of extra fish skins in a neighboring State, at a price a little higher than they were paying at home, did not injure the defendant, and it is not contended in argument that the contract can be avoided for that reason. But in some other particulars the parties have not literally followed the terms of the contract, but by a common understanding and mutual consent have modified the execution of it in details. It sometimes happens that, by such variations from an agreement, the parties leave their rights so uncertain that specific performance of the contract cannot be decreed. But if, after changes are assented to, it is still clear what the rights of the parties are under the contract as modified, there is nothing to prevent the enforcement of those rights by a decree for specific performance. Even if the agreement were wholly oral, it might be specifically enforced. *Somerby* v. *Buntin*, 118 Mass. 279, 287. Whatever uncertainties and difficulties might arise if the plaintiff sought literally to enforce the original provisions of the contract, the parties have by their acts so applied the contract to the new conditions which they have created, as to make it clear that the plaintiff is entitled to have the skins purchased of Tarr and Brother, Wanson and Company, and Shute and Merchant, under the contract as interpreted, modified, and applied by the parties by mutual consent and for their common benefit. Of course third parties who have made contracts with the defendant cannot be compelled to act otherwise than in conformity with their agreements. But the relief to which the plaintiff is entitled, and all that it asks for, will be obtained by an order that the defendant deliver to the plaintiff on demand the fish skins received from the three firms named, on payment to it of what the skins cost the defendant, so long as these shall not exceed the proportion which the plaintiff is entitled to receive.

*Decree accordingly.*

## CHARLES N. BACON vs. CITY OF BOSTON.

Middlesex.   January 15, 1891. — June 25, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, & MORTON, JJ.

*Eminent Domain — Nuisance — Remedy.*

The St. of 1881, c. 303, § 3, empowering the city of Boston, for the protection of its water supply and the abatement of a nuisance, to take land at or near the line of a certain sewer and to construct works for treating the sewage and freeing it from noxious and offensive matters, and providing for compensation for the land so taken, did not authorize the city to create a serious nuisance to the neighboring estate of a private owner by offensive odors and filthy percolations into and through the soil; and such a nuisance, if created, does not constitute a substantial taking of such neighboring estate, compensation for which must be sought under the statute, but recovery therefor may be had in an action of tort for damages.

TWO ACTIONS OF TORT, to recover damages alleged to have been caused to the plaintiff's estate for two successive periods of time between December, 1881, and September, 1884, by offensive odors and filthy percolations through the soil. The cases were tried together in the Superior Court, before *Aldrich, J.,* who allowed a bill of exceptions, in substance as follows.

It appeared from the plaintiff's evidence that he was the owner of an estate in Winchester, worth from $25,000 to $40,000, upon which were a dwelling-house and factory for the manufacture of woollen goods; that the city of Boston, claiming to act under the St. of 1881, c. 303,* had taken lands in Winchester

---

* Section 1 of this act directed the city of Boston to cease emptying sewage into the Mystic Lower Pond, unless purified by the city from all offensive and noxious properties and substances, and section 2 directed the city to cause this pond to be cleansed of such impurities as had accumulated therein.

Section 3 is as follows : " The city of Boston is hereby authorized to take and hold, for the time necessary to carry out the provisions of this act, such lands in the towns of Woburn or Winchester, on or near the line of said sewer, as it shall deem necessary, and may construct such canals, basins, tanks, passageways and works as may be necessary to enable said city to treat said sewage and waters, in order to free the said waters of all noxious, dangerous and offensive matter and properties.   Said city shall make compensation to the owners for such lands as it shall take under this act, and if

adjoining the plaintiff's estate, and on the line of a sewer which was built by it through Winchester, under the St. of 1875, c. 202, and emptied into the Mystic Lower Pond to the extent of 300,000 or 400,000 gallons of sewage a day; that this sewage had been taken by the city, against the plaintiff's objection, from the sewer into canals, basins, and tanks built by it on the land so taken, in order to treat such sewage so as to free it from noxious and offensive matter; that the sewage thus treated gave forth noxious and offensive odors, which penetrated to the adjoining estate of the plaintiff, and rendered him and many of his workmen ill, and caused them great discomfort; that for about one month, in August, 1883, the plaintiff was obliged to close his factory on account of such odors; that the sewage also percolated through the soil and into the plaintiff's estate, and rendered the water in the wells on the estate unfit for drinking or for manufacturing purposes; and that the plaintiff's estate and the plaintiff's goods were greatly injured both in market value and in prestige.

At the close of the plaintiff's evidence, the defendant, who offered no evidence, requested the judge to rule that the plaintiff could not maintain his action; but the judge refused so to rule, and submitted the case to the jury.

The jury returned a verdict for the plaintiff in each case; and the defendant alleged exceptions.

*A. J. Bailey,* for the defendant.

*B. F. Butler & F. L. Washburn,* for the plaintiff.

said city and said owners do not agree any person aggrieved shall be entitled to have his damages ascertained by a jury upon petition to the county commissioners of Middlesex County, the proceedings upon which shall be like those provided for the recovery of damages in the taking of lands for highways."